1
2
3
4
5
6
7
8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARK S. MUSZYNSKI,

11              Plaintiff,                    No. CIV S-04-0082 RRB GGH P

12        vs.

13   D.L. RUNNELS, et al.,                    ORDER &

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

17   1983.  Pending before the court is 1) plaintiff's motion to compel a response to his request for

18   production of documents, filed on April 16, 2007, to which defendants filed an opposition; 2)

19   defendants' motion for summary judgment, filed on June 4, 2007, to which plaintiff filed his

20   opposition, after which defendants filed a reply.

21   Motion to Compel

22        Plaintiff moved for an order to compel response/production to requests for

23   production of documents he states that he served upon defendants on February 28, 2007,

24   asserting that he had not had a response as of April 12, 2007.  Motion to Compel, pp. 1-2.

25   Defendants opposed the motion on the basis that, in the court's discovery order, filed on

26   November 21, 2006, the parties were informed that discovery responses were due within forty-

                                          1

1  five (45) days after a written discovery request was served.  Opposition (Opp.), p. 1.  In addition,

2  defendants noted that three additional days are permitted for service by mail under Fed. R. Civ.

3  P. 6.  Confusingly, defendants then go on to state that defendants' responses were due on March

4  17, 2007, and were served on March 16, 2007, while attaching as an exhibit, a copy of a proof of

5  service indicating that the responses were, in fact, served on April 16, 2007.

6         Defendants are correct that the deadline for serving their discovery responses was

7  April 17, 2007, notwithstanding the confusion generated by the erroneous dates referenced in

8  their opposition.  The proof of service attached to their opposition demonstrates timely service of

9  their discovery responses on April 16, 2007.  Moreover, plaintiff filed no reply indicating that he

10  had not received the responses or that they were in any way deficient.  Plaintiff's motion will be

11  denied.

12  <u>Second Amended Complaint</u>

13         The court has previously set forth plaintiff's allegations, and presents them herein

14  as summarized in Findings and Recommendations, filed on August 23, 2006 (pp. 1-3) (adopted

15  by Order, filed on September 29, 2006): [t]his action proceeds on a second amended complaint,[1]

16  filed in this court on January 31, 2005,[2] against defendant High Desert State Prison (HDSP)

17  Warden D. L. Runnels and HDSP Facility B Captain J. Briddle.  Plaintiff received seven CDC

18  115 Serious Rules Violation Reports (RVR) from March, 2001, through May, 2002, for refusing

19  to comply with Cal. Penal Code § 296.[3]  In addition to losing 60 days for each of good time

20

21         [1] The original complaint and first amended complaint were dismissed with leave to
   amend.  <u>See</u> <u>Orders</u>, filed on May 6, 2004, and November 23, 2004, respectively.
22

23         [2] Although the court's docket entry indicates that this action was filed on February 1,
   2005, the document itself is file-stamped January 31, 2005, by the Clerk's Office.  (Of course,
24  application of the mailbox rule indicates January 27, 2005, as the filing date by plaintiff's
   certificate of service, but where the date is not at issue, this third alternative need not be
   introduced to further confuse the issue).
25

26         [3] Cal. Penal Code § 296 requires persons convicted of specified offenses to provide, inter
   alia, "two specimens of blood...."

1   credit, for a total of 14 months, and having his behavior points increased from 69 to 105, insuring

2   six more years at a maximum security facility, plaintiff was stripped of his work group/privilege

3   group A1/A status and placed on C/C status, earning no credits, and confined to his cell for 24

4   hours a day specifically by defendant Briddle of the Facility B Unit Classification Committee

5   (UCC).  Plaintiff put in writing that he would comply with Cal. Penal Code § 296, once his

6   conviction became final (following his appeal).  Second Amended Complaint (SAC), pp. 3-5.

7           Plaintiff appealed his second CDC 115 RVR to the third level, arguing that he

8   posed no future threat to this country because he is not an American citizen, is subject to a

9   deportation hold, and will be deported to Poland upon his release from prison; the appeal was

10   denied.  On May 10, 2002, plaintiff appeared for his annual review before the Unit Classification

11   Committee (UCC), where his work group/privilege group C/C status was maintained.  Plaintiff

12   appealed his reinstatement to C/C status, after his return from re-sentencing, on January 14,

13   2003, whereupon he appealed, asking for dismissal of his RVRs, restoration of his A1/A status

14   and $200.00 a day for every day of almost two years, March 8, 2001 to April 22, 2003, of having

15   been placed on C status "inappropriately."  The appeal was partially granted on August 8, 2003,

16   at the director's level.  His C status was found to have been inappropriate.  Although partially

17   granting his appeal, plaintiff's claim for money damages was denied.  SAC, pp. 5-6.

18           Plaintiff alleges a violation of his rights under the Eighth Amendment for having

19   been confined on C status in a small, 23-square foot space shared with another inmate for almost

20   two years and almost never allowed outdoor exercise.  Defendants Runnels and Briddle's memos

21   and rules did not allow for outdoor exercise for C-status inmates during most of the time at issue.

22   This lack of exercise resulted in significant weakening/atrophying of plaintiff's muscles, bones

23   and joints, contributed to poor circulation of his blood, heightened his blood pressure, impacted

24   his immune system and generally contributed to a deterioration of his overall health.  In addition

25   to physical pain, plaintiff alleges that he suffered emotional distress and believes that his future

26   health has been affected.   SAC, pp. 6-8.

1      At the outset of his second amended complaint, plaintiff seeks only money

2  damages.  However, in his prayer for relief, he seeks injunctive relief as well.[4]  SAC, p. 2, 9.

3  Motion for Summary Judgment

4      Defendants move for summary judgment on the ground that there is no dispute as

5  to an issue of material fact and defendants are entitled to judgment as a matter of law.  Notice of

6  Motion for Summary Judgment (NMSJ), p. 1.  Defendants also argue that they are otherwise

7  entitled to summary judgment on the basis of qualified immunity.  Memorandum of Points and

8  Authorities in Support of defendants' Motion for Summary Judgment (hereafter, MSJ), pp. 10-

9  11.

10      *Legal Standard for Summary Judgment*

11      Summary judgment is appropriate when it is demonstrated that the standard set

12  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

13  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

14  as a matter of law."  Fed. R. Civ. P. 56(c).

15      Under summary judgment practice, the moving party

16

17      always bears the initial responsibility of informing the district court
       of the basis for its motion, and identifying those portions of "the
       pleadings, depositions, answers to interrogatories, and admissions

18      on file, together with the affidavits, if any," which it believes
       demonstrate the absence of a genuine issue of material fact.

19

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

21  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

22  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

23  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

24  after adequate time for discovery and upon motion, against a party who fails to make a showing

25

26      [4] As plaintiff is no longer retained at C status, it is unclear what form of injunctive relief
  he might be seeking.

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

1    In resolving the summary judgment motion, the court examines the pleadings,

2   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

4   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

5   placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

6   at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

7   opposing party's obligation to produce a factual predicate from which the inference may be

8   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

9   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

10  party "must do more than simply show that there is some metaphysical doubt as to the material

11  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

12  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

13  1356 (citation omitted).

14    On August 8, 2005, the court advised plaintiff of the requirements for opposing a

15  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

16  F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.

17  Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

18    *Plaintiff's Claim*

19    It is helpful to set forth what is precisely at issue in this complaint.  As noted

20  previously by this court in recommending denial of defendants' earlier motion to dismiss:

21          [D]efendants' argument that plaintiff is somehow responsible for
            being allowed almost no access to outdoor exercise for nearly a
22          two-year period because he brought disciplinary restrictions upon
            himself by his own conduct (which restrictions apparently arose by
23          placement on a custody status that, according to the CDC (or
            CDCR) director, was inappropriately imposed) does not absolve
24          defendants of their responsibility to comply with the standards of
            the Eighth Amendment. To the extent plaintiff alleges that being
25          confined to a relatively small space with virtually no outside
            exercise, i.e., 24-hours a day, for nearly two years is a violation of
26          the Eighth Amendment, his claim, on the face of it, is colorable.

6

1  See, Findings and Recommendations, filed on 8/23/06, (pp. 7) adopted by Order, filed on

2  9/29/06.

3          Whether or not plaintiff was wrongly placed on C or C/C status does not, of itself,

4  implicate a constitutional right because, in general, prison officials' housing and classification

5  decisions do not give rise to federal constitutional claims encompassed by the protection of

6  liberty and property guaranteed by the Fifth and Fourteenth Amendments.  See Board of Regents

7  v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972).  Nor does the Constitution guarantee a

8  prisoner placement in a particular prison or protect an inmate against being transferred from one

9  institution to another.  Meachum v. Fano, 427 U.S. 215, 223-225, 96 S. Ct. 2532, 2358 (1976).

10 See Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir.1985) (prison authorities may change a

11 prisoner's "place of confinement even though the degree of confinement may be different and

12 prison life may be more disagreeable in one institution than in another" without violating the

13 prisoner's due process rights); Hanrahan v. Lane, 747 F.2d 1137, 1140-41 (7th Cir.1984)

14 (allegation that prison guard planted false evidence in retaliation for prisoner's failure to pay

15 extortion demand fails to state section 1983 claim so long as procedural due process was

16 provided).

17          Thus, the court construes the gravamen of plaintiff's allegations to be a claim of a

18 violation of his rights under the Eighth Amendment for an extended (approximately two-year)

19 period of deprivation of outdoor exercise.

20          *Undisputed Facts*

21          The following of defendants' undisputed facts (DUF)[5] are not challenged or are

22 wholly unaddressed by plaintiff and will be deemed undisputed with the caveat that, where

23 necessary, they have been modified to reflect the actual information supported by the

24

25          [5] Defendants' documents (DUF, Exhibit A) from plaintiff's central file were authenticated
   by way of a declaration signed under penalty of perjury by the CDCR Correctional Case Records
26 Manager at HDSP.  DUF, p. 1.

documentation relied on support of the facts and to correct page numbers referenced:  1. Plaintiff, Mark S. Muszynski, P-72738, was committed to state prison by Santa Clara County for attempted murder, causing injury to a child, and aggravated arson.  DUF, Exhibit A, Abstract of Judgment, at 2-5.   2. Plaintiff was transferred to High Desert State Prison (HDSP) on May 30, 2000.  DUF, Exhibit A at 8, Chronological History, entry of May 30, 2000.  3. Cal. Penal Code § 296, provides that any adult person who is arrested for, or charged with murder or voluntary manslaughter, or any attempt to commit murder or voluntary manslaughter are required to provide buccal swab samples, right thumb prints, full palm prints of each hand, and blood samples.  DUF, Exhibit B, Cal. Penal Code § 296(a)(1)(B).  4. The California Department of Corrections and Rehabilitation (CDCR) has a comprehensive work incentive program designed to encourage inmates to remain disciplinary free and participate in prison programs.  DUF, Exhibit B, Cal. Code Regs. tit. 15, § 3044.  5. Under the CDCR's regulations the most restricted privilege level is designated as "C" privilege status.  The most restricted credit earning status, zero earning, is designated as "C" credit earning.  Id. §§ 3043.4, 3044.  6. Providing a DNA sample, as required by California Penal Code § 296, is considered to be part of an inmate's program expectations.  Cal. Code Regs. tit. 15, § 3025.  7. Because he failed to provide the required DNA samples, plaintiff was placed on restricted privileges by a classification committee on May 8, 2001.  DUF, Exhibit A, Classification Chrono, at 9.  8. Plaintiff was disciplined numerous times for refusing to provide the legally required DNA samples.  DUF, Exhibit A, Serious RVR Summary, at 11.  9. Plaintiff filed an administrative appeal contending that because he was a Polish citizen, subject to deportation after completing his term of imprisonment, he should not be required to provide DNA samples. DUF, Exhibit A, at 12-22.  10. Plaintiff provided DNA samples on April 9, 2003.  Id. at 23.  11. Plaintiff was removed from C/C status by a classification committee on April 22, 2003.  Id. at 24.[6]  As to DUF no. 12, defendants aver

_____

[6] This document is illegible, but plaintiff does not contest the accuracy of defendants' representation that he was removed from C status on the date specified.

that in 2001, when High Desert State Prison was operating normally, inmates in C/C status were provided with regular outdoor exercise, from 11:30 a.m. to 12:30 p.m. on  Monday through Friday.  DUF, Exhibit C,[7] Attachment 1, Schedule of Level III/IV Inmate Movement.  However, the court notes that the document they rely on in support of that premise is marked "Corrected Copy October 17, 2001" and does not definitively establish the inmate movement schedule that at one point was in place for any period of time other than October, 2001.  13. On May 11, 2001, all inmates in B-Facility were placed on lockdown status, due to a race riot.  DUF, Exhibit C, Attachment 2 at 1-3.  14. On June 10, 2001, two inmates in B-Facility attempted to murder a correctional officer which was thought to be part of the ongoing animosity of inmates directed toward staff.  Searches of the entire prison were [conducted][8]  Id. at 4-17.  15. It was determined that the physical facility had to [be] altered to provide additional security. The modifications included installing fencing in the yard to allow for smaller yard groups, the installation of securable shower grill gates, and the installation of food/handcuff ports on all the cell doors.  Id.  16. B-Facility remained on lockdown status so necessary physical plant modifications could be made.  Id.  17. As of October 2, 2001, the B-Facility construction was completed, along with inspection of a constructed fence and an unlock plan was to be implemented.  Id. at 15 (Sept. 28, 2001 memo to Warden Runnels).[9]  18. On October 16, 2001, a lockdown was again imposed on

---

[7] The authenticity of the document copies submitted as DUF Exhibit C, documents sworn to be kept in the normal course of business at HDSP, is attested to by C. Spirk, HDSP Litigation Coordinator, duly authorized custodian of HDSP-maintained records.

[8] DUF no. 14 breaks off after "were" and is left incomplete, but review of the exhibit indicates that there were searches by staff.  The court notes that a September 13, 2001, memorandum to Warden D.L. Runnels appears to indicate that the June 10, 2001, staff assaults resulted in the placement of the entire HDSP facility on an emergency lockdown from June 10, 2001 to August 2, 2001, an institutional search having commenced on June 18, 2001, and having been completed as of August 1, 2001.  However, physical plant structure modifications being made as a result of the staff assaults kept Facility B on lockdown beyond the date of the memo (Sept. 13, 2001).  DUF, Exhibit C, at 7-8.

[9] An October 10, 2001, memo directed to Facility B staff and inmates indicates that the Sept. 28, 2001 memo to the warden (and approved by the warden) authorized a plan of resumption of normal program from Oct. 10, 2001 to Oct. 14, 2001, with a modified program

1  B-Facility, Building 1(where plaintiff was housed), because someone placed an envelope, with an

2  unknown white powder, under the door of the counselor's office. Id. at 20.  19. Building 1 was

3  restored to normal operations on October 30, 2001.  Id.[10]  20. On December 11, 2001, B-Facility

4  was placed on lockdown status because of a riot involving seven white inmates, on December 10,

5  2001.  Id. at 22-35.  21. The white inmates were returned to normal program on January 3, 2002.

6  Id.  22. On February 15, 2002, the white inmates, along with black inmates, were placed on

7  lockdown status because of a race riot between black and white inmates.  Id. at 26-47.  23. On

8  March 17, 2002, plaintiff signed a chrono stating that he wanted to return to normal program and

9  agreed to refrain from violence.  Exhibit A at 25.  24. On April 3, 2002, an incremental unlock

10  was implemented. DUF, Exhibit C, Attachment 2 at 36-47.  On April 10, 2002, the lockdown of

11  black and white inmates was again imposed because of another riot.  Id. at 48-50.  25. High

12  Desert State Prison then designed a program to individually assess inmates willing to participate

13  in the unlock process.  The program, which was implemented in stages, was called "do my own

14  time."[11]  Id. at 51-79.  Although as fact no. 26, defendants aver that the "do my own time"

15  program was implemented on June 17, 2002, the July 11, 2002 memorandum referenced in

16  support indicates that Step I of the unlock process was *initiated* on June 17, 2002, and concluded

17  on June 30, 2002, without incident, among *participating* inmates; step II started on July 1, 2002,

18  to be completed by July 14, 2002, with an isolated incident as having occurred to date noted (as

19  of July 11, 2002); step III was scheduled to begin on July 15, 2002, with step IV requested to

20  begin as of July 19, 2002, involving contact visiting privileges for black and white inmates

21  _____

22  plan for blacks, southern Hispanics and Mexican nationals.  DUF, Exhibit C, at 18-19.

23  [10] The court finds that the October 30, 2001, memo to the warden does not expressly state
    that the unlock occurred on that date but that B Facility was requesting a return of B-1 inmates to
24  normal program and indicates its approval by the warden.

25  [11]  The court sees no specific reference to the title of the program among the documents
    referenced by defendants in support of DUF no. 25, but notes that it is referenced in a document
    signed by plaintiff in DUF, Exhibit A, at 26.  In any event the actual name attributed to the
26  program is not significant in this context.

participating in the stepped unlock process.  Id. at 62 (emphasis added).  The court further notes
that step III of the step unlock process was set forth in a document entitled "Facility B Modified
Program" for July 15, 2002 until July 28, 2002, as permitting no yard for participants in the
program.  Id. at 64.  Defendants also fail to specifically note the August 1, 2002, memorandum
directed to Chief Deputy Warden A.K. Scribner, stating that the institution was placed on total
lockdown on July 15, 2002, resulting in step III of the stepped unlock process being suspended.
Id. at 66.  In addition, the court's review of a "Facility B Modified Program" schedule for August
7, 2002 until August 11, 2002, reveals no yard for participants.  Id. at 68.  An August 22, 2002,
memorandum directed to Warden Runnels indicates that at step IV of the program that Facility B
inmate participants were to be permitted yard in two groups of up to 200 hundred inmates daily,
the first indication of access to outdoor activity or exercise (which, nevertheless, does not make
clear whether plaintiff specifically would have been a participant).  Id. at 69.  An August 23,
2002, memo to Facility B staff and inmates indicates that step III was completed as of that date
and that step IV inmates were to be permitted exercise yard access on a rotating basis; a "Facility
B Modified Program" schedule for August 26 until September 8, 2002 for step IV inmates sets
forth as to "yard": "Step IV inmates as scheduled by sergeants."  Id. at 73-74.  27. The "do my
own time" program, which included anger management classes, was specifically developed to
end the violence between the black and white inmates.  Id. at 51-79.  28. The program provided
for gradually intermixing black and white inmates in prison activities.  Id.  29. The first step was
access to showers and in building movement.  The next step added meals in the day-room, and
study groups.  Other activities were added over a ten week period of time until all normal
activities were included.  Id.  30. Plaintiff consented to participate in this program on May 30,
2002.  Plaintiff received a certificate of successful completion of the "Breaking Barriers/Cage
Your Rage" program on September 24, 2002.  DUF, Exhibit A at 26-27.  31. On October 21,
2002, a second cycle of the "do my own time" program was initiated.  DUF, Exhibit C,
Attachment 2 at 77.  Defendants do not note that the November 26, 2002, memo referenced,

indicates that step IV of that process, the first step at which access to the exercise yard appears to

have been permissible, did not commence until that day, November 26, 2002; a second memo,

dated November 26, 2002, indicates that the second cycle involves a second group of

participating Facility B inmates. Id. at 80. Nor is it clear whether plaintiff was included at all in

either cycle; if included in the second cycle yard access for him may not have been available

from May 11, 2001, until late November, 2002, if then. Both 11/26/02 memos in Exh. C (at

pages 77, 80) state that "[s]ome inmates continue to be retained on lockdown status because of

their exclusion from the stepped process or because of their individual refusal to participate,"

these inmates to be evaluated by a classification committee on December 10, 2002. Defendants

have produced evidence to demonstrate that plaintiff sought participation in the program on April

3, 2002, and signed and received an anger management certificate on September 24, 2002, but

also observe that plaintiff did not provide DNA samples until April 9, 2003, and was not

removed from C/C status by a classification committee until April 22, 2003. Also, a "Facility B

Modified Program Schedule" for April 10, 2002 through April 16, 2002, shows no yard access

for that week. DUF, Exhibit C, Attachment 2, at 96. See discussion, infra. 32. Plaintiff was

transferred to Santa Clara County on December 10, 2002. DUF, Exhibit A at 7, entry of

December 10, 2002. 33. On December 31, 2002, the entire prison was placed on lockdown

status because information was received of possible staff assaults. Exhibit C, Attachment 2 at

83-92. As DUF no. 34, defendants represent that the December 31, 2002, lockdown was

released, along with the complete unlock of all black and white inmates in B-Facility, on January

10, 2003. Id. However, the January 10, 2003, memo to B-Facility staff and inmates states only

that initial steps were commenced on that date to return to normal operations and would take at

least a week and that the lockdown would not be lifted until "all bed moves" were made. Id. at

88. Another memorandum, dated January 10, 2003, the court notes, sets forth the release of

white and black inmates on that date from individual lockdown to institutional general lockdown.

Id. at 90-91. Further a "Facility B Modified Program" schedule for January 10, 2003 through

January 16, 2003, states that there was to be no yard access for that period.  Id. at 89, 92.  A

January 27, 2003, memo indicates that the second cycle of the Facility B stepped unlock process

concluded on December 9, 2002, without incident and that excluded inmates had had their case

factors evaluated by a classification committee.  This memo, not specifically referenced by

defendants, does not make clear that plaintiff would have been an inmate in cycle 2 or excluded,

and, if excluded and evaluated, what the result would have been.  35. B-Facility was locked down

for several days due to a staff assault on January 31, 2003; all inmates, with the exception of

southern Hispanics, were restored to normal program on February 3, 2003.  Id. at 95-98.  36.

Plaintiff had returned to High Desert State Prison on January 2, 2003.  DUF, Exhibit A at 7, entry

of January 2, 2003.  37. B-Facility was locked down on February 18, 2003, after an anonymous

note, containing threats to kill staff, was found.[12]  DUF, Exhibit C, Attachment 2 at 99-103.)  38.

Normal operations were restored on March 11, 2003, with the exception of southern Hispanic

inmates. Id. at 102.  39. White inmates were locked down between March 17 and March 26,

2003, due to an inmate on inmate assault.  Id. at 104.[13]  40. The white inmates in B-Facility were

again placed on lockdown status on April 23, 2003, due to a stabbing incident.  Id. at 105-114.

41. According to defendants, this lockdown was released on May 20, 2003.  Id. at 115-117.

However, a "Facility B Modified Program" Schedule indicates that white inmates (as well as

northern Hispanics) did not have yard access from May 16, 2003 through May 23, 2003.  Id. at

114.

\\\\\

\\\\\

---

[12] It is not clear why the entire Facility B was locked down when the note was discovered in Building 4, nor whether plaintiff, upon his return, was again housed in Building 1 of Facility B.  DUF, Exhibit C, Attachment 2, at 99.

[13] Information included does not specify that the precipitating incident at issue was an inmate on inmate assault, but it can be logically inferred from the data provided, which makes clear that only white inmates were affected.

1    *Discussion*

2            Nothing herein should be construed as a statement by the undersigned that

3    running a prison, with its mixed population of persons just wanting to be left alone to do their

4    time, and persons who live to make sure that such will be difficult, is anything but a Herculean

5    task.  However, the law that binds the undersigned requires that despite such difficulties, all

6    persons, whether deserving or not, have entitlements to certain basic requirements of life.

7            Defendants first move for summary judgment as to plaintiff's Eighth Amendment

8    deprivation of outside exercise claim first because plaintiff alleges that the outdoor exercise

9    deprivation occurred as a result of restricted privileges when he refused to provide a DNA

10   sample but defendants aver that instead the deprivation occurred because plaintiff was housed in

11   a facility placed on lockdown status for security reasons for "almost all of 2001 and 2002."  MSJ,

12   pp. 5-6.  Defendants concede that "outdoor exercise has been found to be one of life's

13   necessities," but contend that they were faced with competing incompatible legal obligations:

14   one, to protect B-Facility inmates and two, to provide inmates with outdoor exercise.  MSJ, pp.

15   7-8, citing Spain v. Procunier, infra.  Appearing implicitly to concede the objective component of

16   deliberate indifference standard of an objectively serious risk of harm, defendants contend that

17   they subjectively did not intend, with knowledge of the objective risk of harm, to cause harm or

18   to [fail] to take measures to prevent it.  MSJ, at 8, citing Farmer v. Brennan, 511 U.S. 825, 834,

19   114 S. Ct. 1970 (1994).  Defendants assert that riots, acts of racial violence, violent attacks on

20   staff, and threats and plots to kill staff abounded and that a lockdown release involved extensive

21   searches, inmate and staff dialogues, the development and implementation of the "do my own

22   time" program.  Id., at 8.

23           As a second ground, defendants assert their entitlement to summary judgment,

24   assuming the court found that plaintiff was deprived of outdoor exercise due to his placement on

25   C status because plaintiff was solely responsible for the restriction on his access to outdoor

26   exercise (MSJ., pp. 8-9), an argument that carries no more weight in this context than it did in the

14

1  previously denied motion to dismiss, particularly where prison officials found that plaintiff

2  should never have been placed on the restriction, and will not be re-addressed herein.

3       As an alternative third ground, defendants contend that they are entitled to

4  summary judgment on the ground of qualified immunity for the outdoor exercise deprivation that

5  occurred due to lockdowns imposed for security reasons.  MSJ, pp. 10-11.

6       Determining whether a defendant is entitled to qualified immunity involves a

7  sequential three step analysis: 1) viewing the facts in the light most favorable to plaintiff whether

8  there was a constitutional violation; 2) whether the constitutional right was well established; and

9  3) whether it was unreasonable for the official to believe his actions constitutional.  Saucier v.

10  Katz, 533 U.S. 194, 200-201, 121 S.Ct. 2151, 2155-2156 (2001).  Accordingly, the court begins

11  the qualified immunity analysis by determining whether defendants violated plaintiff's

12  constitutional rights.

13       The deprivation of prisoners' outdoor exercise by prison officials can constitute

14  cruel and unusual punishment in violation of the Eighth Amendment.  Spain v. Procunier, 600

15  F.2d 189 (9th Cir. 1979) (upholding district court decision that inmates confined with almost

16  total lack of outdoor exercise for period of years was cruel and unusual punishment, and

17  requiring they be allowed one hour of outdoor exercise, five days a week, absent poor weather,

18  unusual circumstances).  "[S]ome form of regular outdoor exercise is extremely important to the

19  psychological and physical well being of the inmates."  Id. at 199.  The longterm deprivation of

20  outdoor exercise is a denial of a basic need in violation of the Eighth Amendment.  Allen v.

21  Sakai, 48 F.3d 1082, 1087-1088 (9th Cir. 1994); see also, Keenan v. Hall, 83 F.3d 1083, 1090

22  (9th Cir. 1996) (defendants not entitled to summary judgment where plaintiff produced evidence

23  showing deprivation of outdoor exercise for six-month period in administrative segregation).

24  Thus, regular outdoor exercise is necessary "unless inclement weather, unusual circumstances, or

25  disciplinary needs ma[k]e that impossible."  Spain, supra, at 199.  In Hayward v. Procunier, 629

26  F.2d 599, 603 (9th Cir. 1980), the Ninth Circuit found that the deprivation of outdoor exercise

1   and a five-month lockdown in response to a genuine emergency did not violate the Eighth

2   Amendment; however, plaintiffs therein "were allowed approximately the minimum exercise

3   mandated in Spain within a month after imposition of the lockdown."

4            Therefore, although a temporary denial of exercise does not per se constitute an

5   Eighth Amendment violation, denial of all outdoor exercise for an extended period may.  May v.

6   Baldwin, 109 F.3d 557, 565 (9th Cir. 1997) (temporary deprivation of 21 days without outdoor

7   exercise with no medical effects not a substantial deprivation); Hayward v. Procunier, 629 F.2d

8   599, 603 (9th Cir. 1980) (30-day emergency lockdown period was an unusual circumstance

9   justifying denial of outdoor exercise); see also LeMaire v. Maass, 12 F.3d 1444, 1457-1458 (9th

10  Cir. 1993) (while exercise is "one of the basic human necessities protected by the Eighth

11  Amendment," where restriction from outdoor exercise arose from inmate's abuse of the privilege

12  and posing a security risk, plaintiff's Eighth Amendment claim for deprivation thereof failed);

13  but see, Spain v. Procunier, supra, 600 F.2d at 199-200 (9th Cir. 1979).  The Ninth Circuit has

14  clarified the elements necessary to state a deprivation that would rise to the level of an Eighth

15  Amendment violation:

16
17              An Eighth Amendment claim that a prison official has deprived
                inmates of humane conditions must meet two requirements, one
                objective and one subjective.  Allen v. Sakai, 48 F.3d 1082, 1087
18              (9th Cir.1995). "Under the objective requirement, the prison
                official's acts or omissions must deprive an inmate of the minimal
19              civilized measure of life's necessities. The subjective requirement,
                relating to the defendant's state of mind, requires deliberate
20              indifference." Id. (citations omitted).

21  Lopez v. Smith, 203 F.3d 1122, 1132-1133 (9th Cir. 2000).

22            In Lopez, the Ninth Circuit found that plaintiff's claim that he was denied all

23  outdoor exercise for six and a half weeks met the objective requirement for an Eighth

24  Amendment claim.  1132-1133.  The Lopez court noted that:

25
                The clear implication of May is that temporary denials of outdoor
26              exercise must have adverse medical effects to meet the Eighth

16

1      Amendment test, while long-term deprivations are substantial
       regardless of effects.

2

3    Lopez v. Smith, 203 F.3d at 1133 n. 15 (see May v. Baldwin, supra).

4              Plaintiff contends that he was deprived of outdoor exercise from May 8, 2001,

5    until April 9, 2003, because he failed to comply with Cal. Penal Code § 296 and did not provide

6    DNA samples during that period and was placed on restrictive C status, while defendants have

7    produced evidence that those placed on C (or C/C) status, the most restrictive status, at least in

8    2001, and when HDSP operated normally, were provided with regular outdoor exercise, from

9    11:30 a.m. to 12:30 p.m. on Monday through Friday.  DUF 12.  Defendants maintain that

10   plaintiff, therefore, had reduced access to outdoor exercise by having been placed on C status but

11   was not denied all outdoor physical exercise, except at least when HDSP was on emergency

12   lockdown.  Plaintiff in opposition contends that in B-Facility where he was housed, he was

13   precluded from all outdoor exercise based on his restricted status, for almost all of 2001 and

14   2002, because in the few months when the facility was not on lockdown and he could have

15   received outdoor exercise, defendants kept him "on C/C zero-credit earning, 24 hrs. cell

16   confinement status violating his constitutional rights and their own regulations," citing Cal. Code

17   Regs. tit.xv, § 3025.  Opposition (Opp.), p. 2.  In citing the regulation, plaintiff apparently intends

18   to demonstrate that his placement on C/C status was not the appropriate disciplinary action for

19   his having refused to provide DNA samples.  Plaintiff attaches a schedule of B-Facility inmate

20   movement as Exhibit B to counter defendants' contention that inmates placed on C/C status there

21   were not offered yard time.  Although unauthenticated, the Exhibit B appears to be a copy of a

22   January 2007 B Facility inmate movement schedule, which indeed does not show any yard

23   schedule for inmates on C/C status.  In reply, defendants do not challenge the authenticity of the

24   document but contend that plaintiff fails to demonstrate that a January, 2007, schedule can have

25   relevance for any schedule in effect from May, 2001, to April, 2003; defendants maintain that the

26   denial of exercise to which he was subjected arose from emergency prison lockdowns.  Reply,

                                              17

pp. 1-3.  To plaintiff's contention that defendants are not entitled to qualified immunity because under Spain v. Procunier, supra, the long periods of deprivation of outdoor exercise subjected him to cruel and unusual punishment (Opp., pp. 2-3), defendants argue that Spain does not establish an absolute right to outdoor exercise, and that even if defendants were deliberately indifferent, they are entitled to qualified immunity if defendants are found to have reasonably believed their actions were lawful, citing Estate of Ford, supra.

An analysis of the lockdown periods which are undisputed shows that the first lockdown was instituted from May 11, 2001, as a result of a race riot and, noting an incident of an attempted murder of a correctional officer on June 10, 2001, was in effect through at least October 2, 2001, when an unlock plan was implemented, or at least initiated.  A second lockdown occurred on October 16, 2001, and continued until October 30, 2001.  A third lockdown occurred from December 11, 2001, with white inmates returning to normal program on January 3, 2002.  A fourth lockdown was enforced on February 15, 2002, due to a race riot between white and black inmates until incremental unlock began on April 3, 2002.  A fifth lockdown was imposed on April 10, 2002, due to another riot.  As to the lockdown initiated on April 10, 2002, defendants produce no definitive evidence that plaintiff was ever released from lockdown or allowed yard access up to the point of his December 10, 2002, transfer to Santa Clara County.

Plaintiff was then returned to HDSP B-Facility on January 2, 2003, yet another prison lockdown having been imposed as of December 31, 2002.   B-Facility black and white inmates were released from lockdown on January 10, 2003, but B-Facility was again locked down for several days, due to a staff assault, on January 31, 2003, evidently, with the exception of southern Hispanics, restored to normal program on February 3, 2003.  B-Facility was locked down again on February 18, 2003, after a note threatening staff was found, with normal operations restored on March 11, 2003, again with the exception of southern Hispanic inmates.  An inmate on inmate assault resulted in yet another lockdown: B-Facility white inmates were

1   locked down between March 17, 2003 and March 26, 2003, and again on April 23, 2003, due to a

2   stabbing incident, and released on May 20, 2003.

3          Plaintiff was undisputedly maintained on restrictive C/C status from May 8, 2001,

4   until April 22, 2003.  DUF nos. 7, 11.  Plaintiff raises a genuine issue of material fact as to

5   whether or not he was permitted any outdoor exercise during any of that period.  Even if the

6   numerous and extended emergency lockdowns were the primary source of his being deprived of

7   outdoor exercise, defendants have not adequately demonstrated plaintiff was permitted outdoor

8   exercise during any of those limited periods during which there was no lockdown that might have

9   affected plaintiff: from on or around October 2, 2001, to October 16, 2001 (a two-week period);

10  from on or around October 30, 2001, until December 11, 2001 (a six-week period); from January

11  3, 2002, until February 15, 2002 (a six-week period); from on or around April 3, 2002, to April

12  10, 2002 (a period of one week); from December 10, 2002, through January 2, 2003, plaintiff

13  was temporarily transferred (a three-week period); from January 10, 2003, until January 31, 2003

14  (a three-week period); from February 3, 2003, until February 18, 2003 (a two-week period); from

15  March 11, 2003, until March 17, 2003 (approximately a week); from March 26, 2003, until April

16  23, 2003 (a four-week period).  Therefore, the only question that remains is whether defendants

17  could be entitled to qualified immunity for a period of deprivation of all outdoor exercise for a

18  period of 714 days, or approximately two years.

19          Under Spain v. Procunier, supra, 600 F.2d 198, there can be no question that a

20  deprivation of all outdoor exercise for a period of nearly two years constitutes a violation of

21  plaintiff's constitutional rights.  Assuming that defendants violated plaintiff's constitutional

22  rights by depriving him of outdoor exercise for such a period, the next step of the qualified

23  immunity analysis is to determine whether plaintiff's right to exercise was clearly established and

24  whether a reasonable prison official would have understood that to deprive him of exercise was

25  unconstitutional.

26  \\\\\

1      At the time of the alleged deprivations, it was clearly established that inmates had

2  a constitutional right to outdoor exercise.  Spain v. Procunier, 600 F.2d 198.  While it was also

3  clearly established that denying inmates outdoor exercise for the lockdown periods was

4  constitutional if a genuine emergency existed, Hayward v. Procunier, 629 F.2d 599 (9th Cir.

5  1980), the lockdowns do not embrace the entire period at issue.

6      The issue is whether a reasonable prison official would have understood that

7  depriving plaintiff of outdoor exercise for a two-year period violated his constitutional rights.

8  Although defendants have produced some evidence showing the duration and the basis for the

9  emergency lockdowns, defendants have not produced adequate evidence to show that plaintiff

10  had any access to outdoor exercise during the gap periods.  Without this information, the court

11  cannot determine whether a reasonable officer would have known that denying plaintiff outdoor

12  exercise was unconstitutional.  Accordingly, defendants are not entitled summary judgment

13  based on qualified immunity as to plaintiff's Eighth Amendment claim alleging a denial of

14  outdoor exercise.

15      Accordingly, IT IS ORDERED that plaintiff's motion to compel, filed on April

16  16, 2007, is denied.

17      IT IS HEREBY RECOMMENDED that defendants' motion for summary

18  judgment, filed on June 4, 2007, be denied, and this matter be set for trial on plaintiff's claim of a

19  violation of his rights under the Eighth Amendment.

20      These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  \\\\\

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 01/17/08

4  /s/ Gregory G. Hollows

5  GREGORY G. HOLLOWS
   UNITED STATES MAGISTRATE JUDGE

6  GGH:009
    musz0082.msj+

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26